UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| TERRY LEE BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-99 |
| | ) | |
| v. | ) | Honorable Janet T. Neff |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On July 31, 2009, plaintiff filed his applications for benefits[1] alleging a May 25, 2009, onset of disability.[2] (A.R. 141-47).  Plaintiff's claims were denied on initial review.  On August 12, 2011, he received a hearing before an administrative law judge (ALJ), at which he was represented by counsel.  (A.R. 59-80).  On October 12, 2011, the ALJ issued her decision finding that plaintiff was

---

[1]July 31, 2009 is a "protective filing date."  It is the term for the first time an individual contacts the Social Security Administration about filing for benefits. See http://www.ssa.gov/glossary.htm (last visited Sept. 15, 2014).  A protective filing date allows an individual to have an earlier application date than the date the signed application is actually filed.  *Id.*

[2]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus, August 2009 is plaintiff's earliest possible entitlement to SSI benefits.

not disabled.  (A.R. 42-53).  On November 30, 2012, the Appeals Council denied review (A.R. 1-4), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision.  Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

1.     The ALJ failed to properly weigh the medical evidence;

2.     The ALJ failed to properly evaluate plaintiff's credibility; and

3.     The ALJ relied on flawed vocational expert testimony.

(Plf. Brief at 9, 16, 18, docket # 12).  I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ."  42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833

(6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

### Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from May 25, 2009, through the date of the ALJ's decision. (A.R. 44). Plaintiff had not engaged in substantial gainful activity on or after May 25, 2009. (A.R. 44). Plaintiff had the following severe impairments: "degenerative disc disease, status post finger fracture, and depression." (A.R. 44). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 45). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds.  He can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl.  He requires the option to sit/stand every thirty minutes.  He can frequently grasp, handle, or finger with his right upper extremity.  The claimant retains the mental capacity to perform simple, routine, repetitive tasks.  He can frequently interact with supervisors and coworkers, but can only occasionally interact with the general public.

(A.R. 47).

The ALJ found that plaintiff's testimony regarding his subjective limitations was not fully credible:

In terms of the claimant's alleged back pain, the record reflects generally unremarkable physical findings.  The claimant complained of lower back pain and stiffness, radicular pain down both legs, limited range of motion, and weakness and burning in both legs.  X-rays and MRIs of the claimant's lumbar spine revealed moderately advanced, progressive, discogenic degenerative changes at L4-5.  On examination, the claimant had bilateral lower paraspinal muscle tenderness.  He ambulated with a slow, painful gait.  However, his deep tendon reflexes were intact and symmetrical.  He had normal sensation to touch, pinprick, and vibration.  The claimant's primary care physician, Charles [R.] Barker, D.O., prescribed Vicodin for pain.  The records show this medication was well tolerated.  Dr. Barker's treatment records consistently note no changes in the claimant's medication. (Exs. 2F; 10F; 16F).  Several emergency department records reveal the claimant ambulated with a steady gait.  He exhibited full strength in all his extremities and had neurological assessments within normal limits.  (Ex. 20F).  These findings are not consistent with the claimant's claims of disabling pain, but rather tend to support the residual functional capacity for light work with the additional postural limitations noted.

The record shows the claimant broke his right index finger in May 2010.  The claimant fell off a ladder while changing a light bulb.  X-rays showed a comminuted fracture involving the head and neck of the 2nd metacarpal with slight displacement, separation, and also dorsal convex angulation of the fragments.  (Ex. 11F).  The claimant was initially given a splint for his right finger, but he tore it off and was not using it.  (Ex. 11F).  Dr. Barker referred the claimant to an orthopedist, Walter M. Braunohler, M.D., for evaluation.  Dr. Braunohler placed the claimant in a short-arm cast with an Alumafoam outrigger to hold the index finger in slight radial deviation.  After the cast was removed, plaintiff continued to have problems with ulnar deviation of the index finger, with a tendency for overlap of the middle finger.  He also had problems with grinding and stiffness at the MP joint.  (Ex. 19F).  The undersigned accounted for these findings by limiting the claimant to frequent, as opposed to constant, grasping, handling, and fingering with his right upper extremity.

-4-

The claimant's allegations of disabling symptoms and pain were all considered in the light most favorable to the claimant. Taking into account these allegations and the diagnostic findings set forth above, the undersigned reflected limitations, as appropriate, in the residual functional capacity. (SSRs 96-3p; 96-4p; 96-7p). The undersigned notes that, as stated above, the claimant's residual functional capacity is not based on the claimant being pain-free, but rather based on his ability to do work activities on a sustained basis despite limitations, such as pain, from his impairments.

In terms of the claimant's alleged depression, the record reveals medication has been relatively effective in controlling the claimant's symptoms. The claimant initially was treating with his primary care physician, Dr. Barker, for his depression. Dr. Barker prescribed Seroquel. (Exs. 2F; 16F). The claimant reported feeling better and more organized since starting the medication. The claimant started therapy at Ionia County Community Mental Health (CMH) in March 2010. When asked why he was seeking services, the claimant indicated he wanted to "get on disability" and his lawyer said he "should see someone here." However, the record shows that the claimant consistently attended therapy with his counselor, Emily Barr, LMSW, following his initial assessment. (Exs. 12F; 14F; 23F).

The claimant complained of depression, memory and concentration problems, low motivation, and problems with other people. On examination, the claimant was oriented to all spheres. He had a flat, blunted affect, and a sad, depressed mood. His recent memory and  concentration appeared moderately impaired, although his immediate and remote memory seemed intact. The claimant's thought processes were unremarkable. His insight and judgment was intact. The claimant was diagnosed with dysthymia and, later, major depression. The claimant's counselors assigned the claimant Global Assessment of Functioning (GAF) scores of 45, indicating serious symptoms or a serious impairment in social or occupational functioning. However, the claimant indicated that Seroquel and Buspar, which was recently added, alleviated some of his depressive symptoms. (Exs. 12F; 14F; 23F). The claimant also testified that his medication helped with his depression.

On October 13, 2009, the claimant underwent a psychological consultative examination with limited licensed psychologist Neil Reilly, M.A. The claimant complained of depression and low back pain. He stated he has anxiety, feels tired regularly, and does not have a lot of energy. He reported that his medications do help with pain, depression, and sleep. . . . His hygiene was appropriate. He appeared reality-based and oriented, but had low self-esteem. His motivation level seemed low, and his insight was fair. The claimant's thought processes were logical and organized, and his memory and concentration were grossly intact. Mr. Reilly did not observe any signs of psychosis. The claimant's affect did not appear to be in distress, although he did seem somewhat "down." Mr. Reilly did not observed any excessive anxiety, anger, or hostility. The claimant's judgment, fund of knowledge, and abstract thinking appeared to be within normal limits. Mr. Reilly diagnosed the claimant with a mood disorder due to chronic pain with depressed and irritable mood. He assigned the

claimant a GAF score of 52, indicating moderate symptoms or moderate difficulty in social or occupational functioning.  (Ex. 3F).

Based on the medical records and testing as set forth above, the claimant had no more than moderate difficulties in social functioning, and concentration, persistence, and pace.  The undersigned has reflected these limitations in the residual functional capacity by limiting the claimant to simple, routine, repetitive tasks; frequent interaction with coworkers and supervisors; and only occasional contact with the general public.

In terms of the claimant's alleged serious limitations in his ability to perform work-related activity, the evidence and testing does not corroborate the claimant's allegations that his limitations prevent the performance of all work activity.

The claimant described daily activities, which are not limited to the extent one would expect give the complaints of disabling symptoms and limitations.  The claimant has very little problem[] with personal care.  He is able to sweep floors.  He goes shopping for food, and he is able to drive a car.  He enjoys watching television.  (Ex. 4E).  The claimant told the consultative examiner he likes to hunt and fish.  He stated he cooks for himself, and he does his own laundry.  The claimant also socializes with others, and has three or four friends with whom he spends time.  (Ex 3F).  The claimant's reported activities of daily living are consistent with the residual functional capacity set forth herein.

The undersigned notes that the claimant has given several inconsistent statements.  He testified he has not had any alcohol for at least a year.  However, he told his counselor at Ionia CMH he drinks, on average, once a week.  On May 10, 2011, he stated that the last time he used alcohol was the day before.  (Ex. 23F).  The claimant also testified the last time he worked was in May 2009.  But he told his counselor he last worked in June 2009 in South Carolina while he was staying with his daughter.  (Ex. 12F).  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless, the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

* * *

In sum, the above residual functional capacity assessment is supported by the medical evidence of record.  Although the evidence establishes underlying medical conditions capable of producing some limitations, the substantial evidence of record does not confirm disabling limitations arising from these impairments, nor does it support a conclusion that the objectively determined medical conditions are of such severity that they could reasonably be expected to give rise to disabling limitations.  The undersigned finds that the preponderance of credible evidence establishes that the claimant experienced no greater than, at most, mild to moderate functional limitations upon his ability to perform basic work activities as described in 20 CFR 404.1521(b) and 20 CFR [416.]921(b).

(A.R. 47-51). Plaintiff could not perform any past relevant work. (A.R. 51). Plaintiff was 47-years-old as of the date of his alleged onset of disability and 50-years-old on the date of the ALJ's decision. Plaintiff was classified as a younger individual through September 18, 2011. On and after September 19, 2011, plaintiff was classified as a person closely approaching advanced age. (A.R. 51). Plaintiff has at least a high school education and is able to communicate in English. (A.R. 51). The ALJ found that the transferability of jobs skills was not material to a determination of disability. (A.R. 51). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age with his RFC, education, and work experience, the VE testified that there were approximately 12,500 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing. (A.R. 75-77). The ALJ found that this constituted a significant number of jobs. Using Rule 202.21 of the Medical-Vocational Guidelines as a framework,[3] the ALJ found that plaintiff was not disabled. (A.R. 52).

## 1.

Plaintiff argues that the ALJ failed to properly weigh the medical evidence. Specifically, he argues that the ALJ failed to give sufficient weight to the opinions of his treating physician, Charles R. Barker, Jr., D.O. (Plf. Brief at 9-12). In addition, he argues that the ALJ gave inadequate weight to the opinions of a therapist and social worker, Ms. Emily Barr. (*Id.* at 12-15). The issue of whether the claimant is disabled within the meaning of the Social Security Act is

---

[3]The ALJ's opinion should have included a citation to Rule 202.13 because it was the applicable rule after plaintiff reached age 50. The ALJ's failure to cite Rule 202.13 was harmless, because when Rule 202.13 is used as a framework, it supports the ALJ's finding that plaintiff was not disabled.

reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance"[4] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The

---

[4]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected. The weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

A.      Ms. Barr

Plaintiff has no history of psychiatric hospitalization.  (A.R. 323).  He has no history of extensive or intensive treatment for any mental impairment.  On October 13, 2009, Psychologist Neil Reilly performed a consultative examination.  Plaintiff related his ongoing alcohol abuse, a history of substance abuse, and criminal convictions:

> Mr. Brown says that currently he drinks for about one week in a month, and when he does drink, he says he drinks to get drunk.  He admits to being a past heavy user and a binge-style drinker.  He denies any drug use currently, but in the past he has used marijuana, but he denies heavy or regular use.  Legal involvements do include drug-related charges, however, for possession and delivery of substances.  He spent time in jail in 1988.  He had a DUI in 1992 and was Court-ordered into treatment and had seven days in jail.  He also had impaired driving charges at the time of his deer/motorcycle accident [in 2007].

(A.R. 324; *see also* A.R. 240).  Among other things, the psychologist noted that plaintiff's "clothing and hygiene were appropriate, as well as his manners."  (A.R. 325).  Plaintiff's thought processes were logical and organized.  His memory and concentration were grossly intact.  (A.R. 326).  Psychologist Reilly offered a diagnosis of a "[m]ood disorder due to chronic pain with depressed and irritable mood."  He offered his opinion that plaintiff's mood disorder would not prevent plaintiff from working.  (A.R. 328).  It was against this backdrop that the ALJ considered Ms. Barr's opinions.

On March 15, 2010, plaintiff appeared at Ionia County Community Mental Health.  The intake summary leaves no doubt that when plaintiff appeared on a referral from his attorney, it was for the purpose of generating evidence in support of his claims for DIB and SSI benefits:  "I want to get on disability and my lawyer said that I should see someone here."  (A.R. 425).  The intake assessment was performed by Assessment Therapist David G. Marshall.  (A.R. 425-36, 472-82).  Plaintiff reported that he and his wife had divorced a month earlier.  "It wasn't a bitter

divorce." (A.R. 425).  Plaintiff stated that he spent most of his time "hanging out" at his mother's house.  He did not do much because he lacked money to do anything.  He related that he liked to watch sports on television.  (A.R. 425).  Plaintiff stated that he was in a bad car accident in 1992 and that he "used to drink a lot back then." (A.R. 425).  Plaintiff indicated that he had no current legal issues, but had been convicted of manufacturing and delivery of marijuana in 1998 and  impaired driving of a motorcycle in June 2007 after he hit a deer.  (A.R. 426-27).  He graduated from high school and had "last worked in June 2009 for a month while staying with his daughter and son-in-law in South Carolina." (A.R. 436).  Plaintiff had no past psychiatric hospitalizations, no past residential placements, and no past outpatient mental health treatment.  (A.R. 426).  His appearance was appropriate and his behavior was unremarkable.  He was oriented in all three spheres.  His concentration and attention were appropriate.  His mood was depressed.  (A.R. 428).  Plaintiff's thought processes were unremarkable and he appeared to be of average intelligence.  Plaintiff reported that he had no history of inpatient or outpatient treatment for substance abuse.  (A.R. 429).  He stated that he became depressed a year earlier when he lost his job and he continued to struggle finding work.  He expressed a desire to participate in outpatient therapy to improve his coping skills for dealing with the financial troubles that he was experiencing.  (A.R. 432).  Therapist Marshall offered a diagnosis of dysthymia and alcohol abuse.  (A.R. 433).

Ms. Barr reported that plaintiff attended biweekly therapy sessions beginning in March 2010.  (A.R. 484; *see* therapy notes A.R. 436-56, 560-71, 595-97).  Ms. Barr did not perform any psychological tests.  (*Id.*).  She did record plaintiff's subjective complaints.  (*Id.*).  For example, on June 8, 2010, plaintiff told Ms. Barr that he was feeling very down and blaming himself for his situation in life.  He had recently driven his truck into a tree, "totaled his truck, broke his hand,"

received medical attention, and that was the reason for the cast on his right hand.[5]  (A.R. 444).  On September 28, 2010, Ms. Barr completed a "Psychiatric/Psychological Impairment Questionnaire." She offered a diagnosis of alcohol abuse in remission and a dysthmic disorder and gave her opinions regarding plaintiff's functional limitations.  (A.R. 484-91).

The treating physician rule did not apply to the opinions of Ms. Barr because social workers and therapists are not "acceptable medical sources."  *See* 20 C.F.R. §§  404.1513(a), (d), 416.913(a), (d); *see also Payne v. Commissioner*, 402 F. App'x 109, 119 (6th Cir. 2010); *Geiner v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008); *Hayes v. Commissioner*, No. 1:09-cv-1107, 2011 WL 2633945, at * 6 (W.D. Mich. June 15, 2011).  Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule.  *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 2 (SSA Aug. 9, 2006)); *see also Bliss v. Commissioner*, 406 F. App'x 541 (2d Cir. 2011) ("[T]he assessment by the social worker is ineligible to receive controlling weight because social workers do not qualify as "acceptable medical sources.'").  The opinions of social workers and therapists fall within the category of information provided by "other sources."  *Id.* at * 2; *see* 20 C.F.R. §§ 404.1513(d), 416.913(d).  The social security regulations

_____

[5]This was in stark contrast to the "fall[ing] from the top of a ladder" version of events that he gave to the emergency room physician on May 25, 2010  (A.R. 503) and that he repeated to his primary care physician on May 28, 2010 (A.R. 504).  It is notable that Dr. Barker changed the "moderate" use of alcoholic beverages appearing in his April 2010 progress notes (A.R. 499), to "ALCOHOL:  Patient admits to heavy alcohol use," on May 28, 2010.  (A.R. 504).

require that information from other sources be "considered."  2006 WL 2329939, at * 1, 4  (citing 20 C.F.R. §§ 404.1512, .1527,  416.912, .927); *see Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007) (citing 20 C.F.R. §§ 404.1512, 416.912).  This is not a demanding standard.  It was easily met here.

The ALJ carefully considered Ms. Barr's opinions and found that they were entitled to little weight:

> The claimant's therapist, Emily C. Barr, LMSW, provided a psychological impairment questionnaire.  She opined the claimant was markedly limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workweek without interruptions from psychologically-based symptoms and to work at a consistent pace without an unreasonable number and length of rest periods.  She further opined he was markedly limited in his ability to maintain socially appropriate behavior and to adhere to basis standards of neatness and cleanliness; and to set realistic goals or make plans independently. Ms. Barr found the claimant was moderately limited in his ability to understand, remember, and carry out one or two step instructions, and to respond appropriately to changes in the work setting.  She stated the claimant may have difficulty working full days and would likely be absent more than three times per month.  (Ex. 15F).  This opinion is not consistent with the objective medical evidence, the opinion of the DSS reviewer, or the opinion of the consultative examiner.  Therefore, the undersigned gives it little weight.

(A.R. 50-51).  I find no error in the weight the ALJ elected to give to Ms. Barr's opinions.

B.    Dr. Barker

Plaintiff argues that the ALJ violated the treating physician rule in the weight he gave to Dr. Barker's opinions.  Dr. Barker is plaintiff's primary care physician.  He began treating plaintiff at Barker Family Practice on November 21, 2006 (A.R. 255), years before plaintiff's alleged onset of disability on May 25, 2009.  (A.R. 255-302).  On November 21, 2006, plaintiff complained of back pain.  He disclosed that he was smoking 2 packs of cigarettes per day.  He did not disclose any significant history of alcohol use and stated that he had previously used marijuana.  Plaintiff was

not in any acute distress.  His judgment was appropriate.  His mood an affect were appropriate.  His memory was "normal."  Plaintiff's extremities displayed no clubbing, cyanosis, or edema.  Plaintiff had "mildly" reduced flexion and "mildly" reduced left lateral motion.  Dr. Barker counseled plaintiff on smoking cessation and gave him prescriptions for Vicodin and Flexeril.  (A.R. 258-59).

X-rays taken of plaintiff's lumbar spine on April 27, 2009, showed "[m]oderately advanced discogenic changes at L4-5."  (A.R. 309).  The MRI of plaintiff's lumbar spine likewise showed moderately advanced degenerative changes at the L4-5 level.  (A.R. 310).

Dr. Barker saw plaintiff five  times during the period at issue, which began on May 25, 2009, plaintiff's alleged onset of disability date, and ended on October 12, 2011, the date of the ALJ's decision.  (*see* progress notes dated 7/13/09, 12/22/09, 4/20/10, 5/28/10, 9/13/10, A.R. 303-04, 499-500, 384-85, 509-10; *see also* plaintiff's prehearing brief, A.R. 113).  On July 13, 2009, Dr. Barker described plaintiff as a healthy appearing individual in no apparent distress.  Dr. Barker's diagnosis  was low back pain and a generalized anxiety disorder.  He noted that plaintiff's anxiety had improved and that he was not experiencing any complications from the Seroquel that he was taking.  Plaintiff's low back pain was described as unchanged and Dr. Barker noted that plaintiff was being seen by a pain management specialist.[6]  Plaintiff's prescription pain medication was "well tolerated."  Plaintiff continued to smoke 2 packs of cigarettes per day against medical advice.  (A.R. 303-04).

_____

[6]The administrative record does not contain records from any pain management clinic or pain management specialist.  Plaintiff testified that Dr. Barker referred him to a pain management clinic in 2006:  "I just went there for a - I went there to see what they were going to do for me.  They wanted to give me shots in my back, but I would not, I would not do that.  They did not guarantee me the shots were going to work."  (A.R. 66).  Other than that referral in the remote past, Dr. Barker never referred plaintiff to any pain specialist.  (A.R. 66).

On December 22, 2009, plaintiff related that his anxiety had worsened. He continued to consume a "moderate amount" of alcoholic and caffeinated beverages. He continued to smoke two packs of cigarettes per day against medical advice. Dr. Barker gave plaintiff a new prescription for an increased dosage of Seroquel. (A.R. 381-83).

On April 15, 2010, plaintiff appeared at the Spectrum Health emergency room with complaints of "vertical diplopia where he [had seen] 1 image on top of another that started relatively quickly while he was sitting watching TV." He had no headaches, "absolutely no other complaints," and had been "feeling well lately." Plaintiff reported that his medications were "Vicodin, Seroquel, and sleep medication." He did not report any side effects from these medications. Plaintiff was described as a heavy smoker, smoking 2 or 3 packs of cigarettes per day. His strength was 5/5 in all extremities. He had no gross motor or sensory deficits. His extremities showed no evidence of clubbing, cyanosis, or edema. He was oriented in all 3 spheres. (A.R. 368-74, 390-91, 393-94). Further tests were performed to rule out the possibility of a stroke. The MRI of plaintiff's brain was normal. The maxillofacial CT scan indicated possible acute sinusitis. Plaintiff was advised to follow-up with his primary care physician. (A.R. 375-77, 390-96, 511-17, 530-45). On April 20, 2010, plaintiff appeared at Dr. Barker's office for follow-up treatment of his sinusitis. Dr. Barker gave plaintiff a prescription for an oral antibiotic. (A.R. 499-500).

On May 25, 2010, plaintiff appeared at the emergency room and reported to Brian Bosscher, M.D., that he "fell from the top of a ladder" while changing a lightbulb "and then fell landing directly on a box onto his chest." He said nothing about crashing his truck into a tree. Plaintiff complained of anterior chest pain, mild shortness of breath and pain in his "right nondominant hand over the second metacarpal." Plaintiff had some abrasions about the anterior

portion of his chest and sternal tenderness on palpation. Dr. Bosschler diagnosed plaintiff as having a right closed second metacarpal distal phalanx fracture, placed his finger in a splint and referred him to "Dr. Olson," a hand surgeon. Dr. Bosschler gave plaintiff a prescription for Percocet and "sen[t] him home on some anti-inflammatories in the form of Motrin." He stressed the importance of smoking cessation. (A.R. 397-99, 401-23).

On May 28, 2010, plaintiff told Dr. Barker that he had fallen off a ladder in his garage at home on May 24, 2010, and injured his right hand and chest. Dr. Barker noted: "Patient admits to heavy alcohol use" and he was counseled on "the appropriate use of alcohol." Dr. Barker found that plaintiff's right hand was swollen and tender. He did not remove the splint. He advised plaintiff to "ice and continue vicodin prn for pain." Dr. Barker referred plaintiff to Walter M. Braunohler, M.D., a hand surgeon at West Michigan Orthopaedics. (A.R. 384-85).

On June 2, 2010, plaintiff appeared at the emergency room at Spectrum Health and reported that he was experiencing chest pains. Plaintiff's chest x-rays were negative. His EKG was normal. Plaintiff was treated for asthmatic bronchitis and he was instructed to stop smoking cigarettes. (A.R. 388-89, 410-20).

On June 3, 2010, Dr. Braunohler treated plaintiff's broken finger by using a short-arm cast and an alumafoam outrigger to hold the index finder in slight radial deviation. (A.R. 386; *see also* A.R. 525-27).

On September 13, 2010, plaintiff returned to Dr. Barker. On that date, plaintiff reported that his anxiety had worsened, that his back pain had worsened, and that he experienced persistent joint pain which limited his movement. Plaintiff continued to smoke cigarettes and engage in heavy alcohol use. Dr. Barker described plaintiff as a healthy appearing individual in no

distress.  Plaintiff's deep tendon reflexes were 2+ and symmetrical.  His sensation was "[n]ormal to touch, pinprick and vibration."  Dr. Barker concluded that plaintiff's "anxiety ha[d] not changed."  His low back pain was "unchanged."  Plaintiff continued to report generalized osteoarthritis, but Dr. Barker declined to make any adjustment in his medications.  (A.R. 509-10).  There are no progress notes from Dr. Barker dated after September 13, 2010.

Dr. Barker completed a number of documents in support of plaintiff's claims for DIB and SSI benefits:  "Multiple Impairment Questionnaires" dated February 18, 2010 (A.R. 359-66) and May 12, 2010 (A.R. 448-54), a January 4, 2010 letter offering opinions that plaintiff was unable to work and "unable to sit, stand or walk for any period of time" (A.R. 383), forms dated November 10, 2010  (A.R. 524) and June 8, 2011 (A.R. 547) with check marks in boxes indicating Barker opinions that plaintiff was disabled and that plaintiff's drug and/or alcohol abuse was not material to a finding of disability,[7] and an undated letter prepared by counsel and signed by Dr. Barker offering opinions regarding plaintiff's RFC and a conclusion that plaintiff was disabled (A.R. 548).  The ALJ found that Dr. Barker's opinions on administrative issues reserved to the Commissioner were not entitled to any particular weight, and they were not persuasive because they were inconsistent with the objective medical evidence and Dr. Barker's own progress notes:

> The claimant's primary care physician, Dr. Charles Barker, provided several medical source statements.  In them, he opined the claimant could sit for up to one hour and stand/walk for

---

[7]Since 1996, the Social Security Act, as amended, has precluded awards of SSI and DIB benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that drug and alcohol addiction is not a contributing factor to his disability.  *See Cage v. Commissioner*, 692 F.3d 118, 122-25 (2d Cir. Aug. 17, 2012); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability.  *See Gayheart v. Commissioner*, 710 F.3d 380, 365 (6th Cir. 2013).

up to one hour in an eight-hour workday. Dr. Barker opined that the claimant could occasionally lift and carry up to 10 pounds. He stated that the claimant was markedly limited in his ability to use his bilateral fingers/hands for fine manipulations, and moderately limited in his ability to grasp, turn, and twist objects and use his arms for reaching, including overhead. The doctor further opined that the claimant is precluded from pushing, pulling, kneeling, bending, or stooping. The doctor stated the claimant is unable to keep his neck in a constant position. He said the claimant is capable of low stress work, but would likely miss work more than three times per month. The doctor indicated emotional factors contribute to the severity of the claimant's functional limitations. Additionally, he opined that the claimant's pain, fatigue, and other symptoms would frequently interfere with attention and concentration. Dr. Baker also noted the claimant is not currently using alcohol, and he remains "disabled" regardless of alcohol use. (Exs. 8F; 10F; 13F; 21F; 22F). These opinions are not consistent with the objective medical record or the doctor's own treatment or examination records. The undersigned notes the doctor never referred plaintiff to a back specialist, in spite of his very limited functional capacity assessment. Further, to the extent the doctor's opinions are based on the claimant's mental status, the undersigned notes this is outside his area of expertise. For these reasons, the undersigned gives these opinions little weight.

(A.R. 50). The restrictions suggested by Dr. Barker were not supported by the record as a whole and were inconsistent with his own treatment records. The Sixth Circuit has repeatedly held that inconsistencies between proffered restrictions and the underlying treatment records are "good reasons" for discounting a treating source's opinions. *See, e.g.*, *Hill v. Commissioner*, 560 F. App'x 547, 549-50 (6th Cir. 2014); *Fry v. Commissioner*, 476 F. App'x 73, 75-76 (6th Cir. 2012). I find no violation of the treating physician rule.

## 2.

Plaintiff argues that the ALJ failed to properly evaluate his credibility. (Plf. Brief at 16-18). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v.*

-18-

*Commissioner*, 127 F.3d at 528.  The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ."  *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard.  This is a "highly deferential standard of review."  *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012).  "Claimants challenging the ALJ's credibility determination face an uphill battle."  *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005); *see Ritchie v. Commissioner*, 540 F. App'x 508, 511 (6th Cir. 2013) ("We have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'").  "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying."  *Jones*, 336 F.3d at 476.  "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints."  *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable."  *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007).  The *Rogers* court observed that Social Security Ruling 96-7p requires that the ALJ explain his credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Rogers*, 486 F.3d at 248.

-19-

The ALJ found that plaintiff's testimony regarding the intensity, persistence, and limiting effects of his impairments was not fully credible. (A.R. 47-51). The ALJ found that plaintiff gave a number of inconsistent statements regarding his alcohol abuse and other matters which undermined his credibility. (A.R. 40). In addition, it was appropriate for the ALJ to take plaintiff's daily activities into account in making her credibility determination. *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Commissioner*, 245 F.3d at 534. The ALJ's explanation of her factual finding regarding plaintiff's credibility is more than sufficient and is supported by more than substantial evidence.

**3.**

Plaintiff argues that the ALJ relied on flawed vocational testimony. (Plf. Brief at 18-19). Plaintiff's argument is meritless. He conflates the ALJ's factual findings at distinct stages of the sequential analysis, ignores the ALJ's credibility determination, and disregards the more carefully calibrated nature of the ALJ's factual finding regarding his RFC.

The ALJ found that plaintiff retained the RFC for "simple, routine and repetitive tasks" and the ability to frequently interact with supervisors and coworkers, but only occasional interaction with the general public. (A.R. 47). The ALJ's factual finding in this regard is supported by more than substantial evidence. (*see* A.R. 47-51). RFC is the most, not the least, a claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007).

-20-

A.    Step 3 of the Sequential Analysis

The administrative finding whether a claimant meets or equals a listed impairment is made at step 3 of the sequential analysis.[8]    See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).    Step-3 regulates a "narrow category of adjudicatory conduct."    *Combs v. Commissioner*, 459 F.3d 640, 649 (6th Cir. 2006) (*en banc*).    It "governs the organization and evaluation of proof of listed impairments that, if supported, renders entitlement to benefits a foregone conclusion."    *Id.*    "Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the [Social Security Administration's] SSA's special list of impairments, or that is at least equal in severity to those listed.    The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity.    A person with such an impairment or an equivalent, consequently, necessarily satisfies that statutory definition of disability."    *Id.* at 643 (internal citations omitted).    It is well established that a claimant has the burden of demonstrating that he satisfies all the individual requirements of a listing.    *See Elam*, 348 F.3d at 125.    By contrast, the administrative finding of a claimant's RFC is made between steps 3 and 4 of the sequential analysis and it is applied at steps 4 and 5.    *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before

_____

[8]"Administrative law judges employ a five-step sequential inquiry to determine whether an adult claimant is disabled within the meaning of the Social Security Act." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).    Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity.    Next, the claimant must demonstrate that []he has a 'severe impairment.'    A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed impairment.'    If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past.    Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.    The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work." *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

we go from step three to step four, we assess your residual functional capacity.  We use the residual

functional capacity assessment at both step four and step five when we evaluate your claim at these

steps.").

The ALJ determined at step 3 of the sequential analysis that plaintiff's impairments

did not meet or equal the requirements of any listed impairment.  (A.R. 45).  Plaintiff's mental

impairments did not come close to satisfying the demanding paragraph B severity requirements of

listing 12.04:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04.  In making this finding, the undersigned has considered whether the "paragraph B"criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration means three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks.

> In activities of daily living, the claimant has mild restrictions.  The claimant indicated he has very few problems with personal care.  He stated that he is able to sweep the floors.  He goes shopping for food, and he is able to drive a car.  He stated he enjoys watching television. (Ex. 4E).  The claimant told the consultative examiner he likes to hunt and fish.  He stated he cooks for himself and does his own laundry.  (Ex. 3F).  The undersigned finds that the claimant has no more than mild limitations in this area, primarily due to his physical impairments.

> In social functioning, the claimant has moderate difficulties.  The claimant stated he has a short temper, and he distances himself from other people.  He said he does not get along with authority figures.  However, he also indicated that he socializes with others every day.  (Ex. 4E).  He told the consultative examiner he gets along well with his daughters, brother, and mother.  He stated he has three or four friends with whom he has regular contact, although they sometimes argue (Ex. 3F).  The claimant testified he lives with his mother.  Therefore, the undersigned finds that he has no more than moderate difficulties in this area.

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant indicated he has problems with memory, completing tasks, concentration, understanding, and following instructions.  He stated he cannot pay attention for long and

-22-

he does not finish what he starts.  However, he stated he can pay bills and count change. (Ex. 4E).  At the consultative examination, the claimant's memory and concentration were intact.  (Ex. 3F).  The undersigned also notes that the claimant was able to fill out the disability application paperwork without apparent difficulty.  The undersigned finds the claimant has moderate difficulties with concentration, persistence, or pace.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B criteria are not satisfied.

(A.R. 45-46).

Plaintiff is not challenging the ALJ's step-3 finding that he did not meet or equal the requirements of listing 12.04.  Rather, he is attempting to take a portion of the ALJ's finding with regard to the paragraph B criteria at step 3 out of context and substitute it for the ALJ's factual finding that he retained the RFC for "simple, routine, and repetitive tasks" and could frequently interact with supervisors or coworkers, but could only occasionally interact with the general public. (A.R. 47).  The paragraph B criteria used at steps 2 and 3 of the sequential analysis "are not an RFC assessment."  *Policy Interpretation Ruling Titles II and XVI:  Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p (reprinted at 1996 WL 374184, at * 4 (SSA July 2, 1996)). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 or the Listings of Impairments." *Id.* at 4; *see Charlton v. Commissioner*, No. 1:11-cv-992, 2013 WL 5806169, at * 8 (W.D. Mich. Oct. 29, 2013); *Tippett v. Commissioner*, No. 3: 10-cv-1427, 2011 WL 6014015, at * 12 (D. Or. Dec. 2, 2011); *Reynolds v. Commissioner*, No. 10-110, 2011 WL 3897793, at * 3 (E.D. Mich. Aug. 19, 2011); *accord Smith v. Colvin*, No. 3:13-cv-570, 2014 WL 2159122, at * 4 (W.D.N.C. May 23,

2014). The ALJ's step-3 findings do not undermine her finding that plaintiff retained the RFC for simple, routine, and repetitive tasks and the ability to frequently interact with supervisors and coworkers, but only occasional interaction with the general public.

        **B.**      <u>Step 5 of the Sequential Analysis</u>

Plaintiff argues that the ALJ's hypothetical question to the VE was inadequate because it did not take his mental impairment into account. The hearing transcript shows that the hypothetical question included a mental capacity to perform simple, routine, and repetitive tasks, and the ability to frequently interact with supervisors or co-workers, but only occasional interaction with the general public. (A.R. 76). A VE's testimony in response to a hypothetical question accurately reflecting a claimant's impairments provides substantial evidence supporting the Commissioner's decision. *See Varley v. Secretary of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). A hypothetical question is not required to list the claimant's medical conditions, but is only required to reflect the claimant's limitations. *Webb v. Commissioner,* 368 F.3d 629, 633 (6th Cir. 2004). The ALJ found that plaintiff's testimony was not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated complaints. *See Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Parks v. Social Security Admin.,* 413 F. App'x 856, 865 (6th Cir. 2011) ("Hypothetical questions [ ] need only incorporate those limitations which the ALJ has accepted as credible."); *Carrelli v. Commissioner,* 390 F. App'x 429, 438 (6th Cir. 2010) ("[I]t is 'well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.' ") (quoting *Casey,* 987 F.2d at 1235). The hypothetical question the

ALJ posed to the VE was accurate and the VE's testimony in response provided substantial evidence supporting the ALJ's decision.

## Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated: September 18, 2014                    /s/  Phillip J. Green
                                             United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).